IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 19-122-RGA |
| | ) | |
| BRUCE KEVIN FLEMING, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

This Memorandum expressly incorporates Attachment A, which is filed under seal. The government routinely files such an attachment, even though it may or may not contain additional information.

The United States recommends a sentence of incarceration within the Guidelines range of 18-24 months. This sentence is warranted under 18 U.S.C. § 3553(a).

### *18 U.S.C. 3553(a)*

**Nature and Circumstance of the Offense**

Bruce Kevin Fleming, the defendant, has not filed federal income tax returns or paid federal income taxes since 1981. The lone exception is that approximately two weeks ago he filed returns, but paid no taxes, for the years charged in the Indictment, 2012-2016.[1]

The defendant is a well-known, freelance photographer for various publishers, including National Geographic. He has published approximately 26 books, featuring his photographs.

---

[1] The defendant has filed no income tax returns for the years 2017 – 2019 and has made no requests for extensions to file. Tracking third-party reported income (Forms 1099), the case agent advises that Fleming had apparent gross income in those years. A credit card payment processor alone submitted Forms 1099 reflecting payment to Fleming in the following amounts: 2017 - $262,210; 2018 - $193,102; and 2019 - $97,315.

According to his website, he has worked in 28 countries and been recognized as America's Best Observer by Reader's Digest.   On September 30, 2017, the defendant's work was featured in a segment on the CBS evening news.

<u>Income Taxes</u>

For the years charged in the Indictment, 2012 through 2016, the defendant has a personal income tax due and owing of $103,149.   For the years 2002 through 2011, he has an additional $89,380 personal income tax due and owing.   Investigators have insufficient records to determine any tax liability for the years 1982 through 2001.

Before the criminal investigation was initiated, the IRS wrote multiple letters to the defendant in an attempt to have him file returns.   He did not respond.   Based on third-party income reporting documents (Forms 1099), the IRS prepared civil tax assessments against the defendant for the years 1995, 2002, and 2004 through 2009.   Each was ignored.

For years, the defendant was able to avoid the attention of IRS criminal investigators, in large part, because he never paid himself a salary, which would have resulted in a W-2, Statement of Earnings, being sent to the IRS.   That would have put the IRS on notice of the defendant's actual income.   Instead, he simply transferred money from his business bank accounts into his personal account and he used his business bank accounts to pay personal expenses, which were considerable.

The defendant had the money to pay his taxes.   In the five years covering the Indictment, 2012-2016, the defendant had a total net (after business expenses were paid) income of $393,000. However, he spent that income to live beyond his means.   During this same five years, the defendant spent a total of $75,000 in restaurants and bars; he spent $2,350 a month to rent a house in Lewes, one block from the beach and valued online at $800,000.

Only after all administrative attempts to collect taxes from the defendant were exhausted was the criminal investigation initiated.   It is reasonable to conclude that the defendant would still be committing tax offenses but for the criminal Indictment.

In 2017, when IRS criminal investigators first approached the defendant and asked about one of his business entities, he lied, saying it held no bank accounts.   In truth, it did.   Just two weeks earlier he withdrew $11,000 from it.   He had sole signature authority on the account and over the previous several years had deposited more than $1,000,000 into it.

Employment Taxes

In 2013, the defendant hired an accounting firm to handle his payroll.   When he explained that he had not filed personal returns in years, the accountant offered to prepare the overdue returns and asked for the relevant records.   The defendant never produced them, so the accountant handled only payroll taxes.

For the first quarter of 2016 through the third quarter of 2017, the defendant withheld federal taxes from his employees and the accountant prepared seven quarterly payroll returns for the defendant to file with the IRS.   The defendant never filed them and, unknown to his employees, he never turned over to the IRS $22,584 of payroll taxes the defendant withheld from their wages.

Restitution

Restitution to the Internal Revenue Service should be ordered for tax losses totaling $140,019. Second Revised Presentence Investigation Report ("PSR") ¶ 45.

Total Loss

The loss for purposes of the Guidelines, including personal, payroll, and state taxes is $251,785. "PSR ¶ 51.

3

**The Need for the Sentence to Afford Adequate Deterrence**

The Guidelines address the importance of general deterrence in tax cases:

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1, *Introductory Commentary*.

For years, the defendant enjoyed a significant degree of celebrity status, resulting from his body of art work. That status invariably served to perpetuate his sales to the public.   Ultimately, that same celebrity status caused the Delmarva press to report on the defendant's criminal proceedings and his sales drastically declined.   That speaks volumes, not to the defendant's artistry, but to the public's accountability of the defendant for his failure to pay taxes.   His sentencing will not go unnoticed, heightening the need for adequate general deterrence, especially where the payment of taxes is based on voluntary compliance.

**The Need for the Sentence to Reflect the Seriousness of the Offense,
to Promote Respect for the Law, and To Provide Just Punishment**

The Guidelines also speak to the need for custodial sentences in tax cases:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.  Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.

U.S.S.G. § 2T1, *Application Notes: Background*.

**The Kinds of Sentence Available**

Here, probation is not an appropriate option.   The Sentencing Reform Act does not recommend probation for a first offender convicted of a crime of violence "or an otherwise serious offense." 28 U.S.C. § 994(j).   "Tax offenses, in and of themselves, are serious offenses."  U.S.S.G. § 2T1, *Application Notes: Background*.

**History and Characteristics of the Defendant**

The defendant has end stage kidney disease.  He does not contest that the Bureau of Prisons ("BOP") is capable of providing adequate care.   Instead, he claims a period of incarceration would be a "potential death sentence" (Defense Memorandum, page 7) and cites to various district court decisions granting motions for compassionate release, under 18 U.S.C § 3582, where the inmates suffered from chronic kidney disease.

The cases cited by the defendant are of limited applicability to him because the compassionate release statute mandates that courts consider the § 3553(a) factors, which include just punishment and deterrence.   In the defendant's cited cases, each of those inmates already had served significant incarceration prior to being released.[2]

The defendant is not more likely to be exposed to COVID-19 in BOP custody than in Sussex County, where he resides.[3]   Additionally, the defendant is COVID-19 vaccinated, which can be expected to protect him from serious illness.

---

[2] *See United States v. Andrews*, 2021 WL 3085314, (E.D. Tenn. July 21, 2021), (defendant sentenced in 1994, when the Guidelines were mandatory, as a Career Offender to a life sentence; however, if sentenced in 2021, he would not be a career criminal and would have a range of 262-327 months. He already had served 340 months when released); *United States v. Darby*, 2021 WL 2463841, (N.D. Ohio June 17, 2021), (defendant sentenced as a Career Offender to 170 months; however, if sentenced in 2021 the defendant would not be career criminal and have a range of 24-30 months.   He already had served more than eight years when release): *United States v. Ricks*, 2021 WL 1575950, (S.D. Ind. Apr. 22, 2021) (defendant served more than three years and more than 70% of his sentence when released); *United States v. Hodge*, 2021 WL 1169896, (E.D. Ky. Mar. 26, 2021) (defendant served approximately 48% of his 98 month sentence when released); *United States v. Medicine Horse*, 2021 WL 1056526 (D. Mont. Mar. 18, 2021) (78 year-old defendant served approximately nine years of a 30 years sentence when released); *United States v. Parish*, 2021 WL 1152960 (D.S.C. Mar. 17, 2021) (defendant served 153 months of an anticipated 249 month sentence when released); *United States v. Flaherty*, 2021 WL 864868 (E.D. Wa. Mar. 8, 2021) (defendant served approximately 68% of his 262 months sentence when released); *United States v. Sandoval*, 2021 WL 673566 (W.D. Wa. Feb. 22, 2021) (defendant served approximately 70% of his 120 months sentence when released); *United States v. Mapuatuli*, 2021 WL 473719 (D. Haw., Feb. 9, 2021) (defendant served approximately 98 months of a 300-month sentence when released); *United States v. Young*, 2020 WL 2614745 (W.D. Wa. May 22, 2020) (defendant served 15 months of a 60-month sentence, at a prison facility with a 70% COVID positive prison population, before release).

[3] On house arrest, the defendant would be expected to venture into the local community, even if only for health care. Additionally, his cohabitating girlfriend is employed by a nationwide home/business delivery service and presumably works outside the home.

5

<u>*BOP's Successful Response to the COVID-19 Pandemic*</u>

From the moment the pandemic began, the Bureau of Prisons ("BOP") made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control ("CDC") and the World Health Organization. Those efforts continue.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/.   As part of that plan, all newly arriving inmates are quarantined and not released into the general population until fourteen days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentence.   This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

BOP's efforts have been fruitful.   As of this time, vaccines have been administered to all willing BOP staff members.

As of mid-April 2021, BOP estimated that if it continued to receive doses at the then-current pace it will have offered a vaccine to every inmate in its custody by June 1, 2021. As a court recently observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021).

The BOP has 132,281 federal inmates in BOP-managed institutions.   The BOP staff complement is approximately 36,000.   As of October 18, 2021, nationwide, there are 259 federal inmates and 450 BOP staff who have confirmed positive test results for COVID-19 and BOP has administered a total of 233,740 doses to staff and inmates.   (Since the start of the pandemic, 42,956 inmates and 7,991 staff have recovered.   There have been 263 federal inmate deaths and 7 BOP staff deaths attributed to COVID-19 disease.   Of the inmate deaths, 10 occurred while on home confinement.)   Attached, as Exhibit 1, is a BOP listing, from October 12, 2021, with relevant COVID-19 data for each BOP facility.   It shows that most BOP facilities have zero positive inmates, including Philadelphia FDC (331 recovered inmates); Fairton FCI (224 recovered inmates); Fort Dix FCI (1,647 recovered inmates); Allenwood Medium FCI (465 recovered inmates); and Allenwood USP (119 recovered inmates).   As to BOP federal medical centers, Butner FMC has 2 positive inmates with 154 recovered; and Lexington FMC has 1 positive inmate with 581 recovered. https://www.bop.gov/coronavirus/ is updated every weekday.   In contrast to the favorable statistics of these relatively close BOP facilities, at which the defendant likely would be house if incarcerated, is the relevant Sussex County data.

As of October 18, 2021, the total population of Sussex County was 224,384 and only 130,213 persons were fully vaccinated (approximately 58%).   (In Sussex County there has been a total of 34,627 positive cases and 613 deaths resulting from COVID-19 since the start of the pandemic.)   On October 17, 2021, there were 82 positive cases of COVID-19 and 51 hospitalizations, with 9 individuals in critical condition.   The 7-day average of daily new positive cases in Sussex County for the week ending on October 17, 2021 is 93.6.   The latest information, updated daily, detailing the State of Delaware's Coronavirus (COVID-19) data for Sussex County is available at https://myhealthycommunity.dhss.delaware.gov/locations/county-sussex.

*The Defendant Is Vaccinated*

The defendant has received the Moderna vaccine, approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19 disease.[4]

Various studies continue to confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against severe disease as defined by the CDC and 95.3% effective

---

[4] *See* FDA Decision Memorandum, Pfizer–Dec. 11, 2020, https://www.fda.gov/media/144416/download; FDA Decision Memorandum, Moderna - Dec. 18, 2020, https://www.fda.gov/media/144673/download.

severe disease as defined by the FDA. https://www.businesswire.com/news/home/
20210401005365/en/.

The CDC likewise recently reported the effectiveness of the Pfizer and Moderna vaccines in
preventing infection during the same period, and concluded that its extensive data "reinforce CDC's
recommendation of full 2-dose immunization with mRNA vaccines. COVID-19 vaccination is
recommended for all eligible persons . . . ." "Interim Estimates of Vaccine Effectiveness,"
https://www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm (Mar. 29, 2021).

Thus far, the vaccines are proving remarkably effective not just in limiting infection, but in
fulfilling their most important purpose: limiting severe disease and death. The CDC tracks
"breakthrough" infections after full vaccination. *See* https://www.cdc.gov/vaccines/covid-19/health-
departments/breakthrough-cases.html (last accessed June 13, 2021). It states that as of June 7, 2021
over 139 million people had been fully vaccinated with one of the three approved vaccines (Moderna,
Pfizer, and Johnson and Johnson) and among those people the CDC recorded only 3,275
hospitalizations, and 603 deaths (100 of which were asymptomatic or not related to COVID). That
means that the risk of death in this group after full vaccination, with a symptomatic case of
COVID-19, was about 1 in 275,000, a chance far below the ordinary health risks commonly faced by
inmates and all others.   Where a COVID recovered inmate, requested compassionate release, arguing
that his sickle cell trait, high cholesterol and hypertension increased his vulnerability should he be
reinfected, one court summarized:

> Here, Defendant is not at high risk of contracting severe COVID-19 because
> Defendant will have received both does of the Pfizer vaccine by the time he would be
> released. According to clinical trials published on the CDC's website, the Pfizer
> vaccine was 95% effective at preventing COVID-19 in people who did not have a
> previous infection. More importantly for purposes of this motion, clinical trials
> have shown that the Pfizer vaccine is 100% effective at preventing severe disease.
> Therefore, because Defendant will be at little-to-no risk of severe COVID-19 shortly
> after receiving his second Pfizer dose, there are no "extraordinary and compelling
> reasons" justifying a compassionate release in this case. *See United States v. Miller*,

9

No. 13-20928, 2021 WL 1115863, at *2 (E.D. Mich. Mar. 24, 2021) ("The court is aware of no scientifically derived evidence showing that severe complications or death from COVID-19 is likely, or even possible, after an individual has received a full vaccination regimen. Over forty million individuals have been fully vaccinated in the United States, and the court does not know of a single confirmed death of a fully vaccinated individual from COVID-19.").

*United States v. Groom*, 2021 WL 1220225, at *2 (S.D. Ohio Apr. 1, 2021).[5]

In the context of compassionate release, inmates have pointed out that the vaccines may not be 100% effective, that they were not tested in a congregate setting, that they may not be effective for all individuals, and that variants may emerge that bypass the vaccines. Courts have almost uniformly rejected these arguments. One explained:

Given that Rodriguez is or will soon be fully vaccinated against COVID-19, the Court concludes that Rodriguez's obesity and hypertension are not extraordinary and compelling reasons justifying his release. . . . Rodriguez argues that it is unclear how effective the Pfizer vaccine is, how long its effects will last, and whether it protects against the COVID variants, leaving a risk that he could still become seriously ill. Although all evidence to date is that the Pfizer vaccine is very effective, no one claims that it is 100 percent effective, and thus there remains a small risk that Rodriguez could be infected by COVID-19 and become seriously ill from that infection.  But every prisoner runs a small risk of lots of serious medical conditions (including COVID-19). The small risk that Rodriguez may contract COVID-19 and become seriously ill is simply too speculative to justify his release.

---

[5]  Recent decisions overwhelmingly agree with this assessment. *See, e.g.*, *United States v. Roper*, 2021 WL 963583, at *4 (E.D. Pa. Mar. 15, 2021) ("The risk posed to an inoculated Mr. Roper is not an extraordinary and compelling reason for his release."); *United States v. Stiver*, 2021 WL 1110593, at *1 (W.D. Pa. Mar. 23, 2021); *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release to defendant with several chronic medical conditions when defendant had been fully vaccinated against COVID-19); *United States v. Poupart*, 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021) ; *United States v. Shepard*, 2021 WL 848720, at *5 (D.D.C. Mar. 4, 2021); *United States v. Stewart*, 2021 WL 1011041, at *2 (D. Haw. Mar. 16, 2021); *United States v. Decano*, 2021 WL 1095979, at *6 (D. Haw. Mar. 22, 2021); *United States v. Johnson*, 2021 WL 863754, at *2 (W.D. Ky. Mar. 8, 2021); *United States v. Jones*, 2021 WL 1172537, at *2 (E.D. La. Mar. 29, 2021); *United States v. McGill*, 2021 WL 662182, at *5 (D. Md. Feb. 19, 2021); *United States v. Gabbard*, 2021 WL 1037724, at *3 (E.D. Mich. Mar. 18, 2021); *United States v. Williams*, 2021 WL 1087692, at *3 (D. Minn. Mar. 22, 2021); *United States v. Burks*, 2021 WL 1291935, at *2 (D. Minn. Apr. 7, 2021); *United States v. Williams*, 2021 WL 966028, at *3 (W.D.N.C. Mar. 15, 2021); *United States v. Kosic*, 2021 WL 1026498, at *2 (S.D.N.Y. Mar. 17, 2021) (also rejected other objections based on conditions at Fort Dix, where the inmate received the first dose of the Moderna vaccine, and also recovered from COVID-19); *United States v. Cardoza*, 2021 WL 932017, at *1 (D. Or. Mar. 11, 2021); *United States v. Beltran*, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (denying compassionate release to defendant with underlying health conditions when defendant had received first vaccine dose).

*United States v. Rodriguez*, 2021 WL 1187149, at \*1-2 (D. Minn. Mar. 30, 2021).

Accordingly, the prevailing view, as it relates to compassionate release, is that "absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)." *United States v. Smith*, 2021 WL 364636, at \*2 (E.D. Mich. Feb. 3, 2021).[6]   It is possible that the scientific consensus may shift dramatically if vaccine-resistant variants emerge, or the vaccines prove less efficacious than studies to date suggest.   If those possibilities materialize, nothing would prevent Defendant from filing another motion for compassionate release.   *See United States v. Singh*, 2021 WL 928740, at \*3-4 (M.D. Pa. Mar. 11, 2021).   The government could find no cases, citing to *U.S. v. Singh*, and reporting a relevant shift in scientific consensus.

The government's internet search, on September 24, 2021, specific to COVID and chronic kidney disease produced the following:   The CDC and other federal agencies are currently exploring the need for booster shots (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html),

---

[6] *See also, e.g.*, *United States v. White*, 2021 WL 964050, at \*2 (E.D. Mich. Mar. 15, 2021) (denied after first dose, and rejects speculation regarding future effectiveness against variants: "Defendant is free to renew his motion should more information emerge suggesting that the Pfizer vaccine cannot protect him from new imminent strains of COVID-19.   However, at this time, the Court does not find extraordinary and compelling circumstances based on that speculation."); *United States v. Kariblghossian*, 2021 WL 1200181, at \*3 (C.D. Cal. Mar. 29, 2021)   ("Nonetheless, at this time, the available scientific evidence suggests that the Pfizer vaccine is highly effective against known variants of the SARS-COV-2 virus that causes COVID-19) (citing CDC studies and Yang Liu, et. al., Neutralizing Activity of BNT162b2-Elicited Serum, The New England Journal of Medicine (March 8, 2021); https://www.nejm.org/doi/full/10.1056/NEJMc2102017?query=featured_home)); *United States v. Goston*, 2021 WL 872215, at \*3 (E.D. Mich. Mar. 9, 2021) (finding the potential that the Pfizer vaccine does not protect against variants inadequate to justify release); *United States v. Brown*, 2021 WL 1154207, at \*3 (S.D.N.Y. Mar. 26, 2021) (speculation about variants is insufficient); *United States v. Del Rosario Martinez*, 2021 WL 956158, at \*3 n.10 (S.D. Cal. Mar. 10, 2021) (declining to rely on a frequently submitted declaration of Dr. Tara Vijayan, stating, "with all due respect to Dr. Vijayan's expertise and experience, the Court declines to contribute in any fashion to public skepticism regarding the safety and efficacy of the available COVID-19 vaccines or to second-guess the Food and Drug Administration's findings and decision to issue Emergency Use Authorizations for COVID-19 vaccines 'for which there is adequate manufacturing information to ensure its quality and consistency.' The Path for a COVID-19 Vaccine from Research to Emergency Use Authorization, available at www.FDA.gov/COVID19vaccines#FDAVaccineFacts (last visited 3/9/2021).").

and some organizations such as the National Kidney Foundation have already called for the CDC to recommend third doses for immunocompromised individuals. (https://www.kidney.org/news/nkf-applauds-fda-third-dose-covid-19-vaccine).   According to recent public guidance from the CDC, "having chronic kidney disease of any stage can make you more likely to get severely ill from COVID-19."     (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html).   There  is  evidence  that  the  vaccines  are  less  effective  among immunocompromised people, and numerous studies have shown reduced immunologic responses to vaccination among people with various immunocompromising conditions including kidney disease and  dialysis  treatment.  (https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.htm; https://www.kidneyfund.org/covid-19/vaccine-faqs/). For example, the CDC cited to a study that found hemodialysis patients showed a highly diminished antibody response after COVID-19 mRNA vaccination compared to a healthy control group.   The article, published on May 17, 2021, did not conclude the vaccine was totally ineffective for hemodialysis patients.   It reads, in part: "This implies a weaker antibody response in dialysis patients overall, making them less likely to be able to neutralize the SARS-CoV-2 virus even after two doses of the vaccine.   Since these patients are more exposed to infections and prone to a severe course of disease, this could pose a grievous problem in this vulnerable community." (https://doi.org/10.1093/ndt/gfab179).

The government submits that the prevailing scientific view is that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe disease from the virus. The government is not aware of any incidence of a vaccinated dialysis patient becoming infected with COVID.

12

## **CONCLUSION**

During the years involving the defendant's tax offense, a multitude of Americans earned modest incomes, less than the defendant's, but paid their full fair shares of taxes into the Treasury. A sentence of incarceration is warranted.   The defendant does not deserve a variance.

DAVID C. WEISS
United States Attorney

By: */s/ Edmond Falgowski*
       Edmond Falgowski
       Assistant United States Attorney

Dated:   October 20, 2021